## Reed *versus* Penrose's Executrix.

An attachment execution was issued against an insolvent canal corporation, and served on a banker, who was the president of the company, and with whom its funds were deposited by the treasurer, under an agreement to pay interest thereon, and to hold the same subject to call; the garnishee, who was the holder of a large amount of the bonds of the company, pleaded *nulla bona;* the court below held, that the attachment would lie, and that the garnishee could not set off the debt due to him by the company, against the attachment: The case was argued in this court before three judges, and the judgment was affirmed.

*Held,* by LOWRIE, C. J., and STRONG, J., that an attachment execution would lie against an insolvent canal company; and that the funds attached were subject to the operation of the writ.

By WOODWARD, J., that the garnishee, under the circumstances of the case, could not set off the debt owing to him by the company; and by LOWRIE, C. J., that the defence of set-off was not open to him, under the plea of *nulla bona,* but that any defence of the garnishee, against the attachment, as a creditor of the defendant, should have been specially pleaded.

By STRONG, J., that the garnishee had the right to set off his debt against the attachment.

By WOODWARD, J., (1.) That the company being insolvent, the Acts of Assembly did not authorize the issuing of the attachment. (2.) That even if the writ could lawfully issue, it could not be levied on the funds in the hands of the garnishee, to the prejudice of the canal and of the public; that the net profits of the company's business were alone liable to execution, it being an insolvent improvement company. (3.) That the funds were not attachable, because they were within the company's treasury, and not deposits outside of it.

ERROR to the District Court of *Philadelphia.*[*]

This was an attachment execution by Charles B. Penrose on a judgment in his favour against The Erie Canal Company, obtained in the Court of Common Pleas of Erie county, on the 7th October 1856, for $12,066.47, and entered in the District Court of Philadelphia on the 30th December 1856, on a transcript from the court of Erie county. The attachment was issued on the same day, and served on Charles M. Reed, as garnishee. A *fi. fa.* issued from the Common Pleas of Erie county, had been returned *nulla bona.* On the 18th April 1857, the plaintiff's death was suggested, and Valeria E. Penrose, his executrix, substituted. The garnishee pleaded *nulla bona.*

Charles M. Reed was, at the time of the service of the attachment, the president of the company. On the 2d May 1853,

[*] The important principles argued in this case, and the signal ability with which they are treated by the learned judges, have induced the reporter to give it to the profession, although no point involved has received the sanction of a majority of the court. It will be of use, however, should the points again come before the court for decision. Justices THOMPSON and READ, having been of counsel for the defendant, took no part in the case.

[Reed *v.* Penrose's Executrix.]

David McAllaster, the treasurer, made an arrangement with Reed to deposit with him the funds of the company for safe-keeping. An interest account was to be kept, and at the end of each year, the balance of interest was to be charged against Reed. The money so deposited was subject to the draft of the treasurer. At the time of the service of the attachment, the garnishee had in his hands, under this arrangement, $93,705.04, of the company's money.

The company was indebted to the garnishee in a much larger amount than the sum attached in his hands; which he claimed to set off against the attachment.

The money so deposited was received from tolls and water-rents, and was the only means of keeping the canal in repair. The company was an insolvent corporation, and its entire income and means were not sufficient to keep its canal in repair, and to pay more than from two to four per cent. on the interest of its indebtedness. On the 29th December 1856, the board of directors appropriated all its funds, not previously appropriated, to the ordinary expenses of maintaining and keeping the canal in repair, and the *pro rata* payment of interest on its debts.

The Act of 9th April 1850, to limit and regulate sequestrations in the case of the Erie Canal Company, was accepted by the stockholders on the 3d May 1850. *Pamphlet Laws* 437.

The counsel for the garnishee, upon the trial, presented the following points, upon which they requested the court to charge the jury :—

1. That if they believed from the evidence, that the Erie Canal Company was indebted to Charles M. Reed, the garnishee, by bond or otherwise, on the 30th day of December, A. D. 1856, the date of the service of the attachment, and continued so indebted up to the present time, in a larger sum than he held of the money of the said canal company, the plaintiff could not recover against him as garnishee.

2. That if they believed from the evidence, that David McAllaster, Esq., treasurer of the Erie Canal Company, deposited the money of said company, received for toll and water-rents, with Charles M. Reed, the garnishee, for safe keeping, and those moneys were the only means of keeping the company's canal in repair, and the arrangement between the treasurer and Mr. Reed was an individual matter, with which the Erie Canal Company had nothing to do, the plaintiff could not recover against the garnishee.

3. That if they found from the evidence, that the Erie Canal Company was an insolvent corporation, and that its canal was of public utility, that its entire income and means were not sufficient to keep said canal in repair, and to pay more than from two to

[Reed *v.* Penrose's Executrix.]

four per cent. per annum on the interest of the indebtedness of said company, such funds were not subject to an execution-attachment in the hands of any person whatever.

4. That the funds or money of a corporation are not subject to an attachment under the provisions of the Act of the 16th June 1836, in the hands of its treasurer, toll-collectors, or any of its officers, agents, or employees, in the course of the administration of the business of the object of its creation; therefore, if the jury found that the money in the hands of C. M. Reed, the garnishee, at the time of the service of the attachment, and since, was deposited with him by the treasurer, or others authorized by the treasurer, for safe keeping, and was at all times subject to the check or draft of the treasurer, such money was in contemplation of law in the treasury, and not subject to attachment.

5. That if they believed from the evidence, that the Erie Canal Company was insolvent, that its entire means were derived from tolls and water-rents, that the funds so derived were not the subject of attachment-execution in the hands of any person whatsoever; the creditors' remedy was by sequestration.

6. That if they found that the Board of Directors of the Erie Canal Company, on the 29th day of December 1856, and before the service of the attachment on C. M. Reed, the garnishee, appropriated all the money belonging to said company (not previously appropriated) to the ordinary expenses of maintaining and keeping said canal in repair, and for the payment of interest of its debts, the said money was not subject to attachment in the hands of any person.

7. That under the provisions of the Act of Assembly, entitled "An Act to limit and regulate sequestrations in the case of Erie Canal Company," approved the 9th day of April 1850, duly accepted the 3d day of May 1850, at a general meeting of the stockholders of the said company, according to the provisions of the said last-mentioned Act of Assembly, no such attachment as that issued in the present case would lie.

The court refused so to charge, and instructed the jury to find for the plaintiff, reserving the points of law for the opinion of the court *in banc.* The jury, accordingly, found a verdict for the plaintiff for $13,252.99, subject to the opinion of the court upon the points reserved; and the court below subsequently entered judgment for the plaintiff on the points reserved, and delivered the following opinion :—

*Per Curiam.*—" This is an attachment-execution, issued on a judgment against the Erie Canal Company, and served on Charles M. Reed. From the answers of the garnishee, and the other evidence (all documentary) produced on the trial, it appears that David McAllaster, the treasurer of the company defendant, keeps

[Reed *v.* Penrose's Executrix.]

an account with Mr. Reed, depositing his money with him, and the collectors of tolls also paying their money to Mr. Reed, to the credit of the account of the treasurer. The Erie Canal Company is insolvent, unable to pay the principal or even interest of its bonds, which have matured. The most it has been able to do, after providing for current expenses and necessary repairs, has been to pay three per cent. to its bondholders on account of interest. Mr. Reed is the president of the company, the largest stockholder, and holder of its bonds matured and unpaid to the amount of $500,000 and upwards. The plaintiff's judgment is for the principal of bonds of the same character.

" It will be best to consider the points of the cause as they were presented in the able argument of the gentleman from Erie, who appeared on behalf of the garnishee. It exhausted all that could be said on the subject. It was contended, in the first place, that General Reed was the debtor of David McAllaster, not of the Erie Canal Company. But is this so ? If sued by the company, must not a recovery be had against the garnishee ? Could he set off a debt due by McAllaster ? If McAllaster were superseded, and a new treasurer appointed, with notice to General Reed, could he any longer with safety honour Mr. McAllaster's checks ? It is answer enough to this question, to say, that the money deposited with Mr. Reed, is the money of the company, and he knows it. The account is kept in the name of David McAllaster, treasurer, and his receipts show that he received the money for the uses and purposes of the company, and to be accounted for to them. There is nothing then in this point. It is the ordinary case of a debt due to a corporation. The second ground taken, is, that the fund in General Reed's hands is simply money in the treasury of the company, and not therefore liable to an attachment. It may be conceded, that the money of a corporation in the safe keeping of its cashier, treasurer, or other officers, is not liable to attachment. Money in the cashier's pocket or strong box, is in the pocket or strong box of the corporation. He is but a servant, not a debtor of the corporation. Were he robbed, he could plead the loss without negligence on his part as a discharge. But suppose General Reed was robbed. Does he say that he kept the money of the company in a box or bag by itself, distinguished from his own, so that if lost by fire or robbery, he would be discharged ? He could no more plead such discharge, than a debtor could plead any calamity or loss he had met with, to excuse the payment of his debts. These funds he held as a banker, mixed with his own, not as the servant of the company, or of the treasurer. It will make this point stronger, though strong enough without it, to add, that for more than enough to satisfy the plaintiff's claim, General Reed was under contract to pay interest to the company.

" The third point was, that an attachment will not lie against

[Reed *v.* Penrose's Executrix.]

an insolvent corporation, or perhaps, as it was modified, against an insolvent corporation entrusted with the construction and management of some public highway or improvement.   But where is the authority of this position to be found?   No distinction, so far as attachments are concerned, is made between improvement and other corporations, although in the process of sequestration, such a distinction is made, and although in the process of attachment, distinction is made between municipal and other corporations. The reference in the Act of 1845, about attachments, to the Act of 1836, is too vague to justify us in incorporating the proviso as to sequestration in the process of attachment; the reference is more fit to those sections of the Act of 1836, which regulate attachments; nor do the special acts passed in reference to sequestration against this company at all reach this process.

"I have thus disposed of all these points but one, which was considered by the counsel under the first head, that General Reed, instead of being the debtor, was in fact the creditor of the defendant, to an amount much larger than all the funds in his hands. The answer is, that there is fairly to be implied from the relation of banker to the company, as well as the tenor of his receipts, that he was not to plead a set-off, but to account for and pay over whatever money thus came to his hands as banker.   Such a contract, express or implied, precludes his set-off: Henniss *v.* Page, 3 *Wh.* 275; Bank of United States *v.* Macalester, 9 *Barr* 475.   It has been urged, however, that though a contract not to defalcate against the company may be inferred, there is nothing from which a contract not to avail himself of his set-off against a creditor coming in on the fund by process *in invitum*, and having no better equity to be paid than himself, can be implied.   But how is this distinction to be practically carried out?   It is clear, that the company could demand the debt of General Reed for any purpose, and that he could not take defence as to them, that they meant with the money to pay plaintiff.   The attachment places the judgment-creditor in the shoes of his debtor, with all his rights and privileges, just as he stood at the date of the attachment.   It is, to all intents and purposes, a statute assignment of the debt by the defendant in the execution to the plaintiff: Fitzsimmons's Appeal, 4 *Barr* 248."

To this opinion, the garnishee excepted, and judgment having been entered on the verdict, he removed the cause to this court, and here assigned the same for error.

*Gerhard* and *Meredith*, with whom was *Marshall*, for the plaintiff in error.—1. As the fund claimed under the attachment was money received by the Erie Canal Co. for tolls and water-rents of their canal, it is not liable to an attachment in the hands of its treasurer, nor in

[Reed v. Penrose's Executrix.]

the hands of Charles M. Reed, who was merely the depository of the treasurer. Money so deposited is virtually in the treasury, and not subject to an attachment-execution: Buckley v. Eckert, 3 *Barr* 368; Crossen v. McAllister, 2 *Penn. L. J.* 199; Pierson v. McCormick, 2 *Penn. L. J.* 201.

2. Under the Act of June 16th 1836, an attachment-execution cannot be sustained at all against an *insolvent* corporation; the Act of 20th March 1845, does not alter the law as to insolvent corporations: Ridge Turnpike Company v. Peddle, 4 *Barr* 490; Monongahela Company v. Ledlie, 3 *Penn. L. J.* 179.

If an attachment-execution can be sustained against an insolvent corporation, and funds seized and taken in execution that may be absolutely necessary to keep up the improvement, it is an end to all such corporations. No matter how much the public may be interested in the maintenance of the improvement, one creditor, no more meritorious than one hundred others, can close up the improvement: Ammant v. The New Alexandria and Pittsburgh Turnpike Road, 13 *S. & R.* 210; Hawley v. Lumberman's Bank, 10 *Watts* 230; Fretz v. Heller, 2 *W. & S.* 400.

*E. Spencer Miller*, for the defendant in error.

PER CURIAM.—A majority of us regard each of the points decided in this cause, as having been rightly decided by the court below. But we differ considerably in the reasons of our conclusions, and considering that only three of us sat at the hearing, or could sit, we think that no public utility would be subserved by our entering into any discussion of the various questions involved in the cause.

Judgment affirmed, and record remitted.

*Gerhard*, for the plaintiff in error, moved for a rehearing; the motion was set down for argument, and it was ordered that the argument should be confined to the merits of the defence below, founded on the liability of the original defendant's effects to the process of attachment-execution; and to the right of the garnishee to set-off his claim.

*Gerhard* and *Meredith*, for the motion.—I. Does the attachment in execution, issued in this case, lie against the funds of the Erie Canal Company, which have been attached under it?

It appears from the answers of the garnishee and from the accounts which were in evidence, that the moneys in the garnishee's hands are tolls collected on the canal. The canal of the defendants, by the 12th section of their charter, is declared to be a public highway. Toll on a highway is a *compulsory* payment, exacted from those who use the highway. It is against

[Reed *v.* Penrose's Executrix.]

common right: 2 *Roll. Abr.* 522; *Fitzh.*, title "Toll," pl. 3. It can be levied only by virtue of prescription or grant: *Cro. Eliz.* 710.

Whether by prescription or grant it must (1.) Be founded on a consideration moving from the party who levies the toll, to the public who use the highway,—such as keeping the road, bridge, &c., in repair: 3 *Lev.* 37; 2 *Roll. Abr.* 585; *Cro. Eliz.* 711. (2.) It must be *reasonable.* The question whether a toll be *reasonable* is a judicial question, unless it has been ascertained by a statute: 2 *Inst.* 220; *Cro. Eliz.* 559. A *reasonable* toll is one which is not more than an equivalent for the consideration on which it is founded. In the case of an artificial highway (as a canal), constructed by a corporation under authority of law, and the maximum rate of tolls on which is regulated by statute, the toll is founded on two considerations, viz.: (1.) The repair and maintenance of the work for the use of the public. (2.) Compensation for the capital invested in its construction and completion.

The first objects to which the tolls received are by law to be applied, are the repair and maintenance of the work: the surplus only (if any) which remains after these objects have been fully provided for, goes towards the compensation for the capital invested. That this is the order in which the tolls are to be applied appears evidently by the following considerations:—

1. The corporation is subject to a public trust to repair and maintain the work, and so far as the tolls are received on that consideration, they are held by it in trust for those purposes.

2. The obligation to repair and maintain the work is absolute, and if it be not kept in navigable order, (1.) The right to collect toll ceases. (2.) The corporate franchise is subject to forfeiture: People *v.* Turnpike Co., 23 *Wend.* 254. (3.) The corporation or its members are indictable for the neglect: 1 *Mod.* 559; *Kyd on Corp.* 225, 226; Regina *v.* Railway Co., 9 *Car. & P.* 469; Kane *v.* People, 8 *Wend.* 203, 363.

3. The part of the tolls which is applicable as compensation for the capital invested, enures to the private profit of those who invested it, whether stockholders or bond-holders of the company. (The plaintiff below belongs to the *latter* class.)

4. Those who so invested their capital, whether as stock or bondholders, were under no obligation to do so. Their investment was made with a view to their private gain, and if they be disappointed in the result, that gives them no right to indemnify themselves at the public expense.

The principles above stated are not, and cannot be, denied to be firmly established by the common law. The only question is, whether they have been abrogated by statute. It is not pretended

[Reed *v.* Penrose's Executrix.]

that any statute has given the corporation the right (still less imposed on it the duty) of diverting the tolls or water-rents from the repair and maintenance of the work, and applying them to payment of its bond-holders or to dividends among its stockholders, or to any other *private* use. Nor is it pretended, that any statute has relieved the corporation or its members from liability to indictment, if the work be not kept in navigable order,

The real question therefore is, whether any statute has reduced the law of Pennsylvania to the position of authorizing a bond-holder (against the true sense of his contract) to seize the tolls for his private use, and then punishing the corporation and its members as guilty of a *crime*, in not applying those very tolls to the repair and maintenance of the canal: those tolls being levied for that purpose, and being, with the water-rents, notoriously and legally the appropriate and only means for affecting that purpose. The legislature might as well authorize the road-tax to be attached for the private debts of the supervisor.

It is proposed to show that the legislature of Pennsylvania has not been guilty of this outrage, by which the public interests and all the principles of justice would have been sacrificed in order to give to bond-holders or other creditors, the security of a public fund to which they had never looked, and a preference in payment to which they were not entitled.

The Act of 29th March 1845, is the statute relied on by the plaintiff below to support his proceeding. While that Act does extend the process of attachment of stocks, deposits, and debts in execution, to all cases of judgments against private corporations, it does expressly provide for proceeding on such process " in the same manner and under the same rules and regulations as are directed against corporations by the Act of 1836."

These rules and regulations are, 1. That the assets of a corporation (execution against which had been returned "*nulla bona*"), shall be distributed rateably among its creditors. 2. That the tolls and revenues of a public work shall not be diverted from its repair and maintenance. It is clear, therefore, that the legislature did not intend to commit the act of destruction which is attempted to be imputed to it. The court is asked to do that by *construction*.

II. Supposing that the attachment will lie, is the garnishee entitled to set-off against the funds in his hands, the debt due to him by the company?

This debt far exceeds in amount all the funds of the company which the garnishee has or ever had. His right to set-off is resisted, on the ground of an alleged implied contract, that he would not exercise it; and such a contract is (in the opinion of the court below) held to be implied, (1.) From the tenor of his receipts. (2.) From his relation as banker to the company.

[Reed *v.* Penrose's Executrix.]

1. One of his receipts states that the money therein receipted for, was appropriated by the company to the rebuilding of certain aqueducts mentioned in the receipt. Either that created a trust to apply the money to the public purpose of repairing and maintaining the highway in the manner designated, or it did not. If it *did*, it has been already shown that the plaintiff below cannot attach the fund. If it did *not*, then it does not bar the garnishee's right of set-off.

2. There is nothing fiduciary in the relation between banker and depositor; their relation is purely and simply that of debtor and creditor respectively : *Grant on Banking* 1, 2, 3.

In practice, set-off is constantly made by banks against deposits; every debt which falls due, on whatever account, from a depositor, is usually charged against his deposit. In no case has it ever before been pretended that a contract to waive the right of set-off can be implied from the relation of banker and depositor, or banker (borrower) and lender. Though cases have often arisen in which that point would have been material : Bank of United States *v.* Macalester, 9 *Barr* 475 ; Bosler *v.* Exchange Bank, 4 *Barr* 32 ; *Grant on Banking* 336–339 ; Beckwith *v.* The Union Bank of New York, 5 *Selden* 211. There was, therefore, no circumstance from which a contract to waive the right of set-off could be implied; but if there had been, it would have made no difference. For it is settled, that the right of set-off cannot be waived by an *implied* contract, but only by an "*express agreement for a valuable consideration:*" Louden *v.* Tiffany, 5 *W. & S.* 369.

*E. Spencer Miller* and *Eli K. Price*, contrâ.—I. Can an attachment issue against the Erie Canal Company ?

By an Act of 1817, provision was made for execution against a corporation, resembling to some extent that of the Act of 1836. The officer was directed to go to the principal office and demand the amount with legal costs, and if the same were not paid, to seize its personal property, and next its real property. In the case of Ammant *v.* The President, &c., 13 *S. & R.* 210, in which it was held that the franchise of a turnpike company, not being from its nature assignable, or divisible, could not be sold under an execution, the court suggest the hardship to the creditor that a company should be able to pay its debts with its tolls, and not be coercible by execution, and point out sequestration as a remedy which the legislature should provide. This decision was in 1825. In 1828, an act was passed (published as still in force) which provides for attachments against private corporations.

It will be observed, that in this Act no distinction whatever is

[Reed v. Penrose's Executrix.]

made between solvent and insolvent corporations, or between improvement or other corporations; nor is there any, insisting upon equality after a return of *nulla bona*. The proceeding provided, though called an order, in the nature of an order of sequestration, is to have the same effect as a foreign attachment, and of course is to be for the benefit of the creditor who commences it. No exemption is made of tolls or any part of them; no provision for repairs or maintenance. The process secures the "effects" of the company, which word includes not only its tangible property, but its choses in action.

The commissioners to revise the civil code, upon reporting the Act of 1836, which provides for a sequestration, refer to the case of Ammant v. The President, &c., as suggesting the evil which this new process remedied. The judge who decided that case evidently regarded more the hardship to creditors than any advantage to the corporation, in proposing a sequestration, and the commissioners must be supposed to have adopted his views.

The Act of 1828 was, therefore, not repealed by that of 1836. No right or privilege was taken from the creditor. It was merely provided that, in addition to other remedies, the franchise itself might be reached by sequestration in the manner and upon the terms indicated,—that is, by means of a trustee, upon the footing of equality, the work being kept productive by repair. For whose benefit this maintenance and repair were intended, Judge KING very clearly states, in the case of Large v. The Transportation Company, 2 *Ashmead* 404, in which he decides that the bill of discovery provided by the execution-act lay against a corporation.

In the two cases cited in the former argument, it was held that under the Act of 1836, no attachment-execution lay against a corporation. But the Act of 1845 relieves us from the effect of these decisions: The Turnpike Co. v. Peddle, 4 *Barr* 490.

To the plain meaning of this act, two objections are urged: 1st. It is said, the attachment allowed is a peculiar one, in fact a sequestration. 2d. It is urged, that it is not provided for the case of an insolvent improvement corporation.

1. Our view of the Act of 1845 is that the word "corporation" was used in mistake for "individuals;" and that to make its provisions sensible and clear, it must be so construed. Full authority for such a liberty in construction is found in the books: Rex v. Bullock, 1 *Taunt.* 80; Miller v. Solomons, 7 *Exch.* 536; Waugh v. Middleton, 8 *Exch.* 357; Levering v. R. R. Co., 8 *W. & S.* 459; Braddee v. Brownfield, 2 *W. & S.* 280; *Dwarris on Stat.* 717. But suppose we read it as it stands. An attachment against a corporation under it is laid in the hands of a private individual, it

is to be proceeded in to "judgment" as directed against corporations. No such direction as to judgment against corporations is to be found in the act referred to. It is to be proceeded in to "execution," as directed against corporations. That is, a judgment against a garnishee, an individual, for a sum of money, is to be executed like a judgment against a corporation. The absurdity of this will be apparent, upon referring to the provisions which point out, step by step, these different modes of coercing a corporation, which end in a sequestration.

As an argument to support the view that an attachment could not have been intended, it is urged, that the tolls of a company cannot by law be made liable to execution; that they are compulsorily levied from the public by the corporation, which is in return bound as by a trust to apply them towards keeping its works in repair; that they are in fact paid in consideration that the work shall be kept in repair, and if this is not done the right to receive them ceases, the franchise is subject to forfeiture, and the members are indictable; and that under these circumstances it would be unjust to allow them to be seized in execution. The answer to this strained view of the matter is very simple. The Act of Assembly makes no such exception, which exists only in the ingenuity of counsel. It allows money to be demanded, and coin to be seized, without regard to the source from which it is derived.

2. It is said, that admitting that the Act of 1845 does give an attachment of the usual character, it was not intended to give it in case of an insolvent improvement corporation. There is no such exception in the Act. Municipal corporations are excepted, but no others. And the Act of 1828 shows that no such saving was intended: See Pray *v.* Edie, 1 *T. R.* 313; Moser *v.* Newman, 6 *Bing.* 561; Rex *v.* Skone, 6 *East* 518; The Warden *v.* The Dean, 4 *Price* 78.

II. Can the garnishee set-off his bonds? There is no rule to be found in any of the books that an agreement not to set-off is not binding. The cases in this state are clear and full in their expression not only of an opinion that parties may make their own law by contract: Nelson *v.* Von Bonnhorst, 5 *Casey* 355; Insurance Co. *v.* Phœnix Co., 7 *Casey* 449; but that this very law of set-off may be set aside, or waived or dispensed with, by contract: Henniss *v.* Page, 3 *Wh.* 275; Bank *v.* Macalester, 9 *Barr* 475; Louden *v.* Tiffany, 5 *W. & S.* 367.

It is a mistake to say that such a contract must be express. In Hertzog *v.* Hertzog, 5 *Casey* 465, the difficulty of distinguishing between what is expressed and what is implied is clearly pointed out. The only question is from what words or acts such a contract may be implied.

[Reed *v.* Penrose's Executrix.]

In Eland *v.* Karr, 1 *East* 375, it was held that a contract to pay in ready money did not amount to such an agreement. In Louden *v.* Tiffany, 5 *W. & S.* 367, it was held, the words "without defalcation," did not import such an agreement. And though these decisions have not passed without censure, we may safely admit them to be law.

But it has never been held that an agreement to apply the money in a certain way does not import an agreement not to apply it in another way: See 9 *B. & C.* 738; Key *v.* Flint, 8 *Taunt.* 21; Bank *v.* Macalester, 9 *Barr* 475; Jarvis *v.* Rogers, 15 *Mass.* 397.

LOWRIE, C. J.—When we directed the affirmance of the judgment in this case, we were entirely clear on most of the points discussed on the argument, and they seemed to us so simple, that we did not deem it necessary to add anything to the opinion of the court below, relative to them. On two points we had some hesitation, because two of our brethren (Justices THOMPSON and READ), having been of counsel in the cause, did not sit at the argument; and only two of the remaining three of us were in favour of affirming them. Hence, we did not think that any reasons that we could assign for our judgment, ought to be regarded as of any public importance, and we assigned none.

It was, perhaps, quite natural, under these circumstances, that we were urged to grant a rehearing. We directed the motion for a rehearing to be entered, and that its determination should depend on the two questions already alluded to, and which were stated in the order; and that in the mean time the record should be retained.

On the argument of the motion, these questions were presented in a somewhat different light from that in which they were presented on the principal argument. Then no reference was made to the pleadings, and the defendant's plea was not printed with the record, and the questions were argued as if they were raised by the issue. Now, our attention is directed to the fact, that the only issue is on the garnishee's plea of *nulla bona*, and it is insisted, that the principles which remain in doubt, are not raised by that issue.

We think that this position is well taken, and if it had been insisted on at first, we should have had no difficulty. The plea of *nulla bona* is essentially the plea of the garnishee, as garnishee, that he has no effects of the defendant, the Erie Canal Company, in his hands. This was stated on the argument to be the only plea, and it is so stated on one of the paper-books of the plaintiff in error. This plea was manifestly untrue, and was found by the jury to be so, and therefore the judgment in favour of the plaintiff below, was inevitable. If the garnishee had any title to

[Reed *v.* Penrose's Executrix.]

take defence against the attachment, as a creditor of the defendant, he ought to have pleaded his defence as a creditor, and put the issue on that, and not on the plea of *nulla bona*, which is the plea of the garnishee, and not of a creditor.

And surely he had no right, as garnishee, to take any defence that belonged peculiarly to the canal company. He had their funds in his hands, which the creditors were attempting to reach. As garnishee, he had no right to set up any defence for the company. If their funds were exempt from execution, it was for them, and not for him, to plead this exemption. They might appropriate this money to the plaintiff's debt, or allow it to be so appropriated, and the garnishee, as such, had no authority to intermeddle.

The company are a party to the suit, and might have appeared and pleaded any proper defence; but they did not. And no creditor appears as such, to plead that the fund is not attachable. We have no defence on the record, but the untrue one of the garnishee, and all other persons have allowed their rights to depend on that.

Suppose the garnishee had succeeded on his plea of *nulla bona.* According to the plain rules of legal pleading, he would have thereby established the legal conclusion, as against the plaintiff and the canal company, that he had no funds of the company in his hands, though, by his own admission, he had nearly $100,000. Then he might legally keep this amount, without having paid a dollar of it. Possibly, equity might have found some mode of averting this result.

It appears, therefore, that the liability of the funds in the garnishee's hands, to this execution attachment, is not raised by the issue. The canal company puts in no plea to raise it; no creditor of the company does so ; and the garnishee does not, and had no right, as such, to do so. But it was raised on the argument, and twice fully discussed, and it might have been raised in the case, and we feel that we ought to express the view we have of it.

Is the fund exempt from execution because it consists of tolls collected on the canal? No; for, ordinarily, this is the only income that a canal company can have, and to exempt this, would put them beyond all compulsory process. Is it so, because it is the duty of the company to apply the tolls to keep up their works? No; for it is likewise their duty to pay their debts. Is it so, because the company had resolved to apply $70,000 to repairs? As well might it be said, that a man's intention or resolution to buy a new suit of clothes with certain money, exempts it from attachment.

Is it so, because the company is insolvent, in the sense that their income is sufficient only for the repairs of the works, and for

[Reed *v.* Penrose's Executrix.]

the payment of two to four per cent. per annum of their debts ? No; if they were totally insolvent, it is not they, but their creditors, who have a right to claim, that no creditor shall gain a preference over another by judicial process; and creditors cannot do so, except by first founding a title to the property for the benefit of all.   No private corporation, any more than an individual, can keep its creditors at bay, on any general rule of law, so long as it has its own property under its own control; and this corporation has no special privilege that avails it for this purpose.   The insolvency that frustrates the ordinary processes of the law, in favour of creditors, is not mere actual insolvency, or inability to pay its debts, with all its effects, but some legal form of insolvency, by which the property of the debtor is taken into the custody of the law, by sequestration, assignment, or otherwise, to be administered for the benefit of all concerned; and is thus put under an extraordinary process, which the creditors may pursue according to its nature.   Even when the state claims to enforce the application of the tolls to the repairs of the works, it must do so by process in court, and must submit to the rule, that the process first attaching, shall be first satisfied.   It would be strange, indeed, to say that the company may pay all this money to Mr. Reed, on his bonds, or to any other creditor, at their pleasure (as certainly they might, if not for this attachment), and yet, that other creditors have no right to attach it; that they may have property which they may dispose of at their pleasure (subject to the law of fraudulent conveyances), and yet there is no process by which their creditors can reach it.

Does an execution attachment, in the ordinary form, lie against a private corporation ?   The Act of 20th April 1845 is express in the affirmative, for the general principle; but it adds, that the process "*may* be proceeded in to final judgment and execution, in the same manner, and under the same rules and regulations as are directed against corporations by the Act of 16th June 1836, relating to executions."   Taking this addition, as it stands, it is impossible to put it in practice.   The general rule of the act is quite plain, making private corporations subject to *all* execution attachments; and, under ordinary circumstances, the form of the process belonging to the general rule, and prescribed in it, is plain and complete in all its parts.   For ordinary cases, the specific mode, referred to in the added words, is not needed, and they would, if applied to the general rule of the act, frustrate it entirely.   This cannot have been intended.   But, by giving the added words a specific application to fitting cases, according to general rules of law, all may stand.   It is susceptible of such an application, when the garnishee, in an execution attachment, is a corporation, and only then.   It was natural for the legislature, in making provision for the attachment of *stocks* and *deposits,* to

[Reed *v.* Penrose's Executrix ]

think of banks or other corporations as the garnishees, and then to provide that against such garnishees, a *judgment in attachment* should be enforced in the same manner as other judgments against such corporations. When individuals are garnishees, this special rule has no application, and then the general rule of the law is to be the guide. We are not called upon to say anything relative to the Act of 9th April 1850, concerning sequestrations of this corporation, except that a law regulating a special remedy does not, by implication, take away a general remedy of another character.

Was the garnishee entitled to set off the bonds, held by him against the company, as a defence to the execution attachment? Under the pleadings, we think not; and for the present we limit our opinion as thus expressed. No set-off is pleaded, and in real fact, none was claimed; because the garnishee did not wish to apply the deposits to himself; but only to use his bonds as a means of protecting the deposit from being seized for any particular creditor; and this may account for the absence of a plea of set-off.

To sustain the issue on his plea of *nulla bona*, the garnishee showed that he held a very large number of the bonds of the company, amounting to near half a million of dollars; but he did not offer to set off any of them, or plead his right or intention to do so. If he had done so, we should undoubtedly have had a replication from the company; for they would hardly have allowed him thus to appropriate all the deposit to his own use, without dispute. Yet that would be the effect of sustaining a plea of set-off, or a defence by way of set-off.

The defence here is to prevent the plaintiff from getting a preference; but it is set up in a form that would give an immensely greater preference to the garnishee, if he is to have a judgment on the ground of set-off; for that would enable him to keep the whole deposit. If he should succeed on the plea of *nulla bona*, then the deposit would be satisfied by operation of law, without his paying anything, or giving up any of his bonds.

STRONG, J.—When this case was first argued, no one of the assignments of error, in the opinion of a majority of this court, was sustained. An affirmance of the judgment of the court below was thus inevitable. We allowed, however, a motion for a reargument, and on that motion, the case has been a second time fully argued. Yet, notwithstanding the second argument, we remain individually of the same opinion as when the judgment of affirmance was entered. Our convictions are diverse upon the principal points of the case, and this fact induces me to express my own views, unsupported though they be by the judgment of either of my brethren.

[Reed v. Penrose's Executrix.]

The questions presented by the record are substantially but two. The plaintiff in error contends that the fund in his hands is not subject to seizure under the process of attachment execution; because, first, he is not the debtor or bailee of the defendant in the execution; secondly, because, even if he be a debtor or bailee, the fund is tolls of the canal, and therefore not attachable; thirdly, because the defendant in the execution is an insolvent improvement company, and therefore no attachment can be issued to seize debts due to it, or deposits which it has made.

The second position taken by the plaintiff in error is, that the execution defendant is a debtor to him to a larger amount than the entire fund in his hands, and that he may defalcate the debt due to him.

I propose to examine each of these questions. It may be premised that the effect of an attachment execution served, wherever it lies, is to place the attaching creditor in the same relation to the garnishee as that occupied by the debtor before the attachment was laid: In re Baldwin's Estate, 4 *Barr* 248. The attachment is an equitable assignment of the thing attached; a substitution of the creditor for the debtor, to the latter's rights against the garnishee. Whatever rights, therefore, the Erie Canal Company had against Gen. Reed, either as its depositary or debtor, Mrs. Penrose has succeeded to, by virtue of her attachment, on the supposition that the fund is of such a character that it can be attached. Now I cannot doubt that, when Gen. Reed received the fund from the treasurer of the company, under an agreement that he should pay interest, he became the debtor of the company. True, the treasurer might have withdrawn it, but only as the agent of the company. If his agency had ceased, if he had resigned, or had been dismissed from office, payment to him would have been a mispayment, and would have been no protection against the company. The case shows that Gen. Reed was aware, at the time when the money was deposited with him, that it did not belong to the treasurer. He knew that the act of deposit was the act of the company through its agent, and his opening the account with Mr. McAllaster made the debt none the less due to the company. In Frazier v. The Erie Bank, 8 *W. & S.* 18, it was held, that if an agent procure the note of his principal to be discounted, and deposit the proceeds in bank to his own credit, the principal may maintain an action therefor against the bank in his own name, notwithstanding the bank, after notice, had paid the money on the check of the agent. There is nothing then in the first reason given why the fund is not liable to attachment in the hands of Gen. Reed.

Nor is there more in the second. Admitting that "tolls" are not included in the terms "deposits of money (belonging to a defendant) in any bank, or with any person or body corporate or politic, and debts due to him" (the statutory description of things

[Reed *v*. Penrose's Executrix.]

made liable to attachment), yet the fund in the garnishee's hands can in no proper sense be called tolls. It lost its character as such when it was deposited with him. He did not receive it as such from the transporters on the canal. He did not treat it as such when he agreed to pay interest. It is none the less a deposit, or a debt, because it may have been created by an accumulation of tolls. If the company had received it from the toll-gatherers, and had lent it, taking a bond from the borrower, it would hardly be contended that, in that shape, it was not-subject to attachment, because it remained tolls. What less is it now? The personal property of most of our improvement companies is the product of tolls and freight received. Does it still remain tolls when converted into locomotives or canal-boats, or placed upon interest for future use or distribution? · The Act of Assembly looks to the nature of the thing attached, when an attempt is made to seize it, and not to what it was at any time before.

It is hardly necessary to remark, that the resolutions of the board of directors of the canal company, appropriating a part of the money to the rebuilding of certain aqueducts, and the remainder to repairs and the payment of interest, cannot possibly be regarded as having in any sense changed the character of the fund. Those resolutions were at most but a declaration of unexecuted intention, not in themselves an appropriation. The directors might have revoked them any day, and have diverted the money to any other purpose. The money was not put beyond the debtor's control. The interest of the company therein was not divested, nor was any ownership or new right created in another. The fund still remained a debt due the company, or a deposit of money, the precise thing which the Act of Assembly declares to be attachable.

A more important objection is that which insists that an attachment execution cannot be sustained against an insolvent improvement corporation.

The case shows that at the time when the creditor's attachment was levied, the Erie Canal Company was insolvent; unable, indeed, to pay the interest upon its *entire* indebtedness. If the question were to be determined alone under the provision of the Act of June 16th 1836, the objection would be unanswerable. .That act was the first to give to a creditor, execution against the choses in action of his debtor, but it distinguished the remedies against natural persons from those against corporations. It subjected the latter to sequestration, but it did not authorize an attachment against them. This was first held by GRIER, J., in the District Court of Allegheny county, in the case of The Monongahela Navigation Company *v*. Ledlie, 3 *Penn. L. J.* 179, and was afterwards ruled by the Supreme Court in Ridge Turnpike Company *v*. Peddle, 4 *Barr* 490. It is well to note the provisions of the Act of 1836, respecting executions against corporations. In this way, the pur-

[Reed v. Penrose's Executrix.]

pose and meaning of subsequent legislation will be better understood. These provisions were intended for all corporations, except municipal, whether solvent or not. It was required, that all executions should command the sheriff or other officer to levy the sum recovered of the goods and chattels, lands and tenements, of the corporation in the manner prescribed in the act. That mode was, first, by making a demand at the banking-house or principal office. If no person could be found on whom demand could be made, or if demand proved fruitless, the officer was next required to seize personal property of the corporation, that is, personal property, as distinct from rights and credits, as will hereafter appear. If the corporation defendant was a banking company, the officer was required to take current coin. Thirdly, if no sufficient personal property could be found, the officer was commanded to levy upon real estate of such corporation, and proceed to sale thereof, as the law provided for the sale of land in other cases, where others than corporations are defendants. If all this proved unavailing, if the execution was returned unsatisfied, in whole or in part, the act next allowed a writ of sequestration to issue, to sequester the goods, chattels and credits, rents, issues and profits, tolls and receipts. In this last case, the direction is, that the net proceeds shall be distributed among all the creditors of such corporation, according to the rules established in the case of the insolvency of individuals, reserving however to the court which issued the writ the power to direct a portion of the revenue of any work, in the maintenance or repair of which the public may be interested, to be expended thereon. It was by this writ alone that, under the Act of 1836, the debts due to any corporation, or the deposits of money made by it, could be reached in execution. The corporation was incapable of being forced into insolvency distribution, by arrest, as a natural person then could be. Nor could sequestration be resorted to, until a return to an execution furnished record evidence that there was neither personal nor real property upon which it could be levied. But when an execution had been so returned, solvent, equally with insolvent corporations, were liable to sequestration. No distinction was made. Even a savings bank, the whole of whose property consisted in moneys loaned, but which was abundantly able to pay all its debts, might be forced into insolvency after a return of an execution unsatisfied, if it had not money on hand to pay the judgment forthwith. And what was more, the creditor could reach the credits of a corporation, either solvent or insolvent, only by the slow process of sequestration, and not even by that, until notice and time had been given to the debtor to remove the credits beyond his reach.

Such was the state of the law when the Act of March 20th 1845 was passed: *Pamph L.* 189. The fourth section of this latter act was intended to enlarge the rights of creditors, to give

them a remedy against corporations which they had not before. The act is remedial, and should be construed so as to remove the mischiefs then existing, and to carry out the purpose of the legislature. It extends so much of the Act of June 16th 1836, " as provides for the levy and recovery of stock, deposits, and debts due to defendants, by process of attachment and *scire facias*, to all cases of judgments to be issued against corporations (other than municipal corporations)." The language is general, and is applied to all corporation defendants, with the single exception named. All others, whether solvent or insolvent, improvement or not, are within its provisions. The mischief to be remedied existed in regard to all, and therefore the remedy provided was extended to all. Indeed, the process of attachment execution was more needful for a creditor of an insolvent than for one of a solvent corporation. The greatest difficulty was in obtaining payment from the former. I see no indication in the act of any legislative design to distinguish between them, and it seems to me, that were we to make a distinction, it would be legislation rather than construction. The exception of municipal corporations alone furnishes the strongest implication, if help be needed from an implication, that no other exception was intended. How then it can be maintained, that the Act of 1845 is applicable only to solvent corporations, that it gives the process of attachment execution against them only, and not against those which are insolvent, and that the latter can now only be reached by sequestration, I cannot understand.

An argument is attempted to be drawn from the part of the fourth section succeeding that I have quoted. It is that, in which the legislature have said, that from and after the passage of the act, "All such process (the attachment and *scire facias* authorized), which hereafter may be issued, may be proceeded in to final judgment and execution, in the same manner, and under the same rules and regulations as are directed against corporations, by the provisions of the Act of 16th June 1836, relating to executions." It is said this requires that the process must be pursued, as process is directed to be pursued against corporations, and that is by sequestration. But what process is to be thus pursued? The act answers, all such process of attachment and *scire facias*. That is an absurdity. How can an attachment execution, and *scire facias* against a garnishee, be conducted as sequestration? And besides, if the Act of 1845 applies only to solvent corporations, and if the attachment against them must become virtually sequestration, then of what use is the act? What additional remedy has it given to the creditor? He had a right, under the Act of 1836, to resort to a writ of sequestration. I cannot suppose that the legislature intended nothing by the enactment of 1845, following as it did, so soon, the decision of Judge GRIER, that a creditor of a corpora-

[Reed *v.* Penrose's Executrix.]

tion was not, under the former act, entitled to an attachment execution. What then does this last provision of the act mean? It must be admitted that, like much modern legislation, it is obscurely expressed, and exhibits marks of haste, and absence of careful consideration. Yet, I think it may be understood, and may, without doing violence to its language, be construed so as to be consistent with the former .part of the section, and so as to effectuate the obvious design of the legislature in the passage of the act. Bearing in mind that the purpose was to give to creditors of corporations, a remedy for the collection of debts, which they had not before, and that a process of attachment, I would read this provision of the Act of 1845 as follows: " And from and after the passage of this act, all such process (attachment and *scire facias*), which hereafter may be issued against corporations, may be proceeded in to final judgment and execution, in the same manner, and under the same rules and regulations, as are directed by the provisions of the Act of 16th of June 1836, relating to executions." Thus read, the whole act becomes intelligible and consistent with itself. Nor is such a reading an unwarrantable or unprecedented interference with its language. It is mere transposition. No word is added, none exscinded, none substituted. That such a transposition makes the act express what the legislature intended, I cannot doubt. That they did not intend to be understood as speaking " of rules and regulations" of attachment process, as " directed" by the Act of 1836, " against corporations," is apparent, from the fact that there were no such rules. It was attachments against corporations, not rules against them, which they had in view. They gave the process itself, which before that time had been applicable only to natural persons, and applied to the conduct of that process the rules and regulations which the Act of 1836 prescribed for its use against natural persons.

Thus understanding the Act of 1845, and convinced that it authorizes attachment execution against all corporations, except municipal, whether solvent or not, I do not feel at liberty to consider the argument, so much pressed upon us, resulting from the alleged impolicy of subjecting insolvent improvement companies to the embarrassment, and perhaps destruction, which may result from the use of such process. It must be presumed that the legislature considered that when they passed the act. At all events, my own views of public policy are not to prevail against a positive statutory enactment.

I do not perceive that the Act of April 9th 1850 has any applicability to this case. It has no reference to attachments. It neither gives, nor prohibits them. I concur, therefore, with my Brother Lowrie, and with the learned President of the District Court, in the opinion, that the attachment in this case was well laid.

I am unable, however, to convince myself that the garnishee is

[Reed *v.* Penrose's Executrix.]

not entitled to avail himself of the protection of the statute of defalcations, but unfortunately, in entertaining this opinion, I stand alone. The twenty-second section of the Act of June 16th 1836 declares that execution may be had of the debts due to a debtor, stock held by him in any body corporate, or deposits made by him with any person, or body corporate or politic, "subject, nevertheless, to all lawful claims thereon, of such body corporate or person." The garnishee may make the same defence to a *scire facias* at the suit of an attaching creditor, which he could have made against a suit brought by the debtor himself. Now, had The Erie Canal Company sued General Reed for the money in his hands, why would not the statute of defalcation have protected him, if he had chosen to use it? I think I have shown that he is their debtor, and nothing more. The fund he has in hand is money had and received for their use. Certainly, if this is not so, their creditor cannot obtain it by attachment. She proceeds upon the assumption, that it is a simple debt due from the garnishee to the judgment-debtor. At the same time, the company is debtor to General Reed, in a still larger amount. He holds their bonds past due, against a claim upon which they have no defence. If he had sued upon his bonds, can any one doubt that the obligors might have set off his indebtedness to them? And now when they have sued him, or, which is the same thing in effect, when the attaching creditor has sued in their right, if he cannot use the same defence, it must be because there is something peculiar in his situation; something that renders the statute of defalcations inapplicable to his case. It is not pretended, that he obtained possession of the fund by fraud. If he had, equity might, perhaps, deny to him even a statutory advantage obtained by his own covin. Yet even if he had obtained the money tortiously, a suit for it as a debt, would have been a waiver of the tort, and the defendant might still have availed himself of a set-off, as was ruled in Bank *v.* Macalester, 9 *Barr* 475.

This right of defalcation is a legal right, secured to a defendant in all cases where he holds demands against a plaintiff, due in the same right, and due at the time when the suit was commenced against him. I agree that he may, by express contract, preclude himself from pleading a set-off. Such a contract, founded on consideration, would bind him. This I understand to be the principle of Henniss *v.* Page, 3 *Whart.* 275, and I think a defendant may also debar himself from using a set-off by a contract not express. Thus, if he receives money delivered to him for his application to a particular use, his receipt may amount to an agreement not to apply it to any other use, and of course, not to his own, by pleading a set-off. The case of The Bank *v.* Macalester goes no further than this. But, while I admit that a defendant may bar himself from using a set-off, by contract, either express or implied, I deny that

[Reed v. Penrose's Executrix.]

he can be deprived of his legal right to defalcate by anything less than a contract. In the present case, there is no allegation of any express contract not to plead a set-off. Certainly none is proved. The only question, therefore, is whether one is to be inferred from the transactions between the debtor and garnishee. It is hardly necessary to say, that it is not to be implied from the intention or expectation of the creditor at the time when the debt due him was created, nor from the inconvenience to which he may be subjected, if the set-off be allowed. Very rarely does a creditor expect that the debt due him, will be paid in any other way than with money. Its being extinguished by defalcation may subject him to inconvenience and embarrassment not anticipated, but all this does not divest a defendant of his legal right. No doubt The Erie Canal Company had no expectation that General Reed would retain the funds deposited with him under any claim of set-off. No doubt his having done so would have embarrassed them, but they exacted no agreement from him not to plead it; they relied upon what was at most an honorary obligation. I see nothing more than an honorary obligation to waive his right. of set-off. He was the banker of the company, and received their money in the ordinary course of business as a banker. But is a banker bound to answer the checks of a depositor, when he holds the depositor's notes or bonds past due? Is any such engagement implied in the transaction of deposit? I think it has never been so decided. The contrary has been, again and again: Davis v. Bowsher, 5 *T. R.* 492; Rogerson v. Ladbroke, 1 *Bingh.* 94; Bank v. Armstrong, 4 *Dev.* 524; Albany Commercial Bank v. Hughes, 17 *Wendell* 94. And even more than this, it is settled law, that if the banker does pay on the call of a depositor, he thereby discharges the depositor's accommodation endorser of notes which the banker holds, past due. How can this be, if there be no right to retain the money deposited, if by receiving as banker he has precluded himself from pleading a set-off?

Nor is there anything in the receipts which General Reed signed, from which can be inferred an engagement not to defalcate. Most of them are mere acknowledgments, that sums of money, being canal funds, had come to his hands "to be accounted for when required." Is that anything more than a promise to pay on demand? It is not even as much, for it is fulfilled by giving a credit on the bonds which he held, whereas a promise to pay on demand is a promise to pay in money. One of the receipts recites that the sum received was the amount appropriated by said company for the rebuilding of the Elk Creek and Walnut Creek aqueducts, upon which he was to pay interest until called for. This is a mere description of the ownership of the fund, and an identification of it. It was not itself an appropriation, not a receipt by the banker for a purpose designated, as was the case in The Bank v. Macal-

ester.    General Reed, as banker, had nothing to do with its appropriation, assumed no agency for any such purpose.    He had no right to apply the money to building the aqueducts.    His only engagement was to pay the company.    Of course, then, there having been no stipulated use, he was free to use his set-off.

Nor is there anything in the fact that he was president of the company.    That might be important, if we were inquiring for the expectations of the depositors, or seeking for an honorary obligation.    But his presidency did not prevent his making any contract with the company, and he did contract as banker.    Not as president did he receive the money, not as president is he sued, but as a party to a contract.

In all this case, I have failed to discover any evidence of a contract, express or implied, that the garnishee would not plead the statute of defalcation, and I cannot but think, that a denial to him of the right of set-off, is enforcing what is only an honorary obligation, in a court of law.    I cannot refuse to a party a legal right, because it may work harsh results, because it may disappoint expectations, or may produce disaster to one whose expectations it may cause to fail.    I repeat, that set-off is a legal right, and, though it may be waived, no one can be compelled to waive it, except by the force of his own contract.    And this contract must be positive and unequivocal: Louden *v.* Tiffany, 5 *Watts & Sergeant* 367.    Nothing less than this will bar a debtor against defalcating from his creditor's claim, a debt due by the creditor to himself.    Of course, I am not speaking of cases of fraud, nor of those peculiar and technical trusts cognisable only in a court of equity, in opposition to which set-off can never avail.    This is no such case.

WOODWARD, J.—The shape which this case has taken, makes it proper to state it more fully than is customary.

On the 7th October 1856, Mr. Penrose obtained a judgment against the Erie Canal Company, in the Common Pleas of Erie county, for some $13,000, and issued his *fi. fa.* thereon, which was returned 30th December 1856, "*nulla bona.*"    On the same day he transferred his judgment, by transcript, to the District Court of the city of Philadelphia, and issued an attachment execution thereon, which was served on Mr. Reed, as garnishee.    At the time of the service of this attachment, Mr. Reed had in his hands, of the company's money, the sum of $93,705.04.    According to the evidence taken and sent up to us, this sum was made up entirely of tolls and water-rents earned by the canal.

Mr. McAllaster was the treasurer of the company; he received these tolls and rents, and deposited them with Mr. Reed, as a

[Reed *v.* Penrose's Executrix.]

banker, at Erie, under an arrangement made between them, in May 1853, whereby the treasurer was to make deposits with Reed, who was to pay interest upon them, according to an agreed rate.    At the end of the year, the balance of the interest account was to be charged over against Reed.  Deposits were made during the business season of the canal, as fast as the tolls were received by the treasurer.  Near the close of the year, the treasurer was accustomed to make his report to the board, of the amount of money in the treasury, including the interest account.  The superintendent, about the same time, made report of the condition of the canal, and his estimate of the necessary amount of money required to be expended through the winter and spring, before the receipt of tolls the next spring; and, thereupon, the board of directors always appropriated the entire amount of money in the treasury, first, to meet the necessary repairs and ordinary expenses of the canal, and the balance to pay interest on the bonds and certificates of indebtedness of the company.  The appropriations made by the board, in accordance with this usage of business, on the 29th of December 1856, the day before Penrose's attachment execution was served, exceeded the entire amount then in the treasury, by from ten to fifteen thousand dollars, and were, to that extent, an anticipation of the tolls of the next year.  The necessity to rebuild certain aqueducts on the line, and which were indispensable to the navigation, compelled this large appropriation.  Reed was not only the treasurer's banker, but he was president of the company, and its creditor to an amount upward of five hundred thousand dollars, for bonds of the company, of the same nature as those on which Penrose recovered his judgment.

The company was insolvent, and had been for upwards of seven years.  The most it has been able to pay on its debt since 1850, in any year, was four per cent., and that for but one year.  From two to three per cent. is generally the full extent of its ability to pay.    Upon these uncontradicted facts two questions arose:—

1st. Were the company's moneys in Reed's hands subject to process of execution attachment?

2d. Is the garnishee entitled to set off the debt due him by the company against the funds in his hands?

The District Court was of opinion with the plaintiff on both questions, and ruled that the fund was attachable, and was not liable to the set-off, and so entered judgment against the garnishee for the amount of the plaintiff's judgment.  On removal of the record into this court, these questions were fully argued by counsel before three of our number, Judges THOMPSON and READ not sitting, because they had been of counsel in the cause before they came upon the bench.  The three who sat found themselves unable to agree on the grounds of a judgment; but no two of them being

[Reed *v.* Penrose's Executrix.]

for reversing the judgment below, it was ordered to be affirmed, without assigning reasons. Before the record was returned to the District Court, the garnishee's counsel applied for a reargument, and we directed that motion to be heard, in an argument on the merits of the two questions I have stated. All the other questions in the case were thus set aside. We heard a full argument again.

The immediate question before us is, shall the case be reargued? I reply, certainly not. After having had the reargument, it becomes us to decide the case on its merits, and either reaffirm the judgment below or reverse it. Nor am I willing to throw these questions out of court on an objection to the pleadings. Doubtless, the garnishee might have pleaded the facts specially, but under the plea of *nulla bona*, the parties went to trial on the merits in the court below. The court considered and fairly decided those questions; and after we have had them argued before us twice—the last time under our express order—without notice of the pleadings, I do not feel at liberty to say, that the questions do not arise under the plea of *nulla bona*. I would not say it, in the present posture of the case, if I thought so; but I do not think so. It has been usual to try cases against garnishees in execution attachments, on their merits, under the plea of *nulla bona*, and I know of no rule of pleading which forbids it, especially when the parties acquiesce. The statute likens this process to foreign attachment; and in foreign attachment, *nulla bona* is properly the general issue: *Sergeant on Attachment* 92: and on page 100, he cites three early cases from 1 and 2 *Dallas*, which lay down the rule, that if the property attached in the hands of the garnishee is not liable to attachment, it seems, the court from which it issued may be applied to, to dissolve the attachment, or perhaps the garnishee may plead it to the *scire facias*, or give it in evidence on the plea of *nulla bona*. Since our attachment executions came into use, this "*perhaps*" has resolved itself into a uniform practice; and this case having been tried in accordance with that practice, ought now to be decided on its merits. Addressing myself therefore to the two questions on the record, I decide that, under the circumstances of the case, the fund in Reed's hands was not liable to attachment execution; and that virtually disposes of the question of set-off, for he claims the set-off only in case the execution be sustained. I would reverse the judgment, and leave the plaintiff to pursue his remedy by sequestration.

To explain and justify the grounds of this opinion, it will be necessary for me to state, somewhat at large, the execution process which the legislature have provided for judgment-creditors in general, and for judgment-creditors of corporations in particular.

Before 1836, goods and chattels, lands and tenements, only could

[Reed *v.* Penrose's Executrix.]

be seized in execution in Pennsylvania in satisfaction of judgments. Stocks held in incorporated companies, if not seizable as goods or chattels, were liable by virtue of an Act of Assembly of 29th March 1819. See Lex *v.* Potters, 4 *Harris* 295.

But a judgment-debtor might be without lands, goods, or stocks, and yet have plenty of money on deposit, or invested in bonds and mortgages, or other choses in action. That such a debtor, entirely able to pay his creditor, should be permitted to defy him, was a just reproach to the remedial power of the law. And accordingly the legislature, on the suggestion of the codifiers, provided by the Act of 16th June 1836, § 22, that the defendant's stocks, deposits, and debts due him, whether held and owing by corporations or persons, should be liable to execution " *like other goods and chattels, subject, nevertheless, to all lawful claims thereupon of such body corporate or other person.*"

" Like other goods and chattels." What does this mean ? Certainly not that the mode of seizure was to be the same, for a subsequent section provides that the manner of levying and seizing credits and choses in action shall be like that allowed in foreign attachment. Possibly, it meant that the attachment must be taken before resort should be had to real estate. But certainly it meant that the attachment might be taken in the first instance in which any execution process could go out—with or without a *fi. fa.* If this be the meaning of the statute, it puts to flight the idea that is discernible in some of the adjudged cases, and in some of the arguments before us in this case, that execution attachment must be preceded by a return of *nulla bona*, and is the remedy against parties only whose insolvency is thus far established. It is a remedy against a non-paying debtor, whether solvent or insolvent, of a nature exactly similar to a *fi. fa.*, though it is to be employed after the fashion of foreign attachment.

The other clause quoted from the statute is worthy of notice also—" subject, nevertheless, to all lawful claims, &c."

This means, undoubtedly, that the creditor takes the place of the defendant, and is entitled to receive what the defendant would be entitled to have and enjoy. If the fund is subject to liens, or under equities to others, the creditor must discharge them before he can take the fund. He acquires no rights against third parties superior to those which the defendant possessed. I shall have occasion hereafter to apply this principle to the facts of this case, and shall endeavour to show that the funds in Reed's hands were subject to " lawful claims" of great importance, that would be wholly defeated, if the attachment were sustained.

But I go on for the present to observe, that this legislation, whereby rights and credits and choses in action were subjected to execution, did not apply to judgments against corporations. This

[Reed *v.* Penrose's Executrix.]

court said so in Turnpike Co. *v.* Peddle, 4 *Barr* 490. It will be well to consider the reason of this.

On the same day of the enactment of the provisions already referred to, and as parts of the same statute, the legislature provided a special mode of execution against corporations. The very competent codifiers who drafted the law, made a compact and harmonious system. They first provided for execution against judgment-debtors who were natural persons—then for executions against corporations. When they came to deal with corporations, they considered that this class of debtors would be in possession of visible and tangible property, real or personal, sufficient to yield satisfaction to the ordinary process of *fi. fa.*—or else that they would be insolvent corporations, and as such fit subjects for proceedings by sequestration. The codifiers and the legislature accordingly provided, in the four articles of the 72d section (see *Purdon* 169), for the satisfaction of executions against corporations (other than municipal), out of their real and personal estates; but if satisfaction could not be obtained from these sources, and the *fi. fa.* should be returned unsatisfied in whole or in part, then by sections 73, 74, and 75, sequestration was provided of their "*goods, chattels and credits, rents, issues and profits, tolls and receipts.*" Here was the distinction plainly marked out between solvent and insolvent corporations. *Fi. fas.* for the creditors of the one, sequestration for the creditors of the other. And in this manner the equitable distribution of the assets of insolvent corporations among all their creditors, was intended to be secured. But more than this was meant. The corporation might owe certain obligations to the public. If it were an improvement company, it was intrusted with its franchises, that it might maintain for the public convenience a highway; and the equitable remedy by sequestration must be so guarded as, whilst satisfying the private creditor, it should not sacrifice public rights.

Chief Justice TILGHMAN, who had suggested the sequestration, 13 *S. & R.* 212, had suggested also its necessary limitation. Speaking of a turnpike road, the learned Chief Justice said, that in providing the remedy (sequestration), "care should be taken that so much of the tolls as is necessary, shall be in the first place applied to the repair of the road, and only the *net profits* subject to the payment of debts." Heedful of this suggestion, the legislature said, in the 74th section of the Act of 1836, "that in the case of any work in the maintenance or repair of which the public may be interested, and which may, from time to time, require a portion of the revenue thereof, as aforesaid, to be expended thereon, the court which awards such writ shall make such allowance for such purpose, and otherwise take such order thereon, as the public good shall require."

Such was the Act of Assembly which gave the execution attach-

[Reed *v.* Penrose's Executrix.]

ment. It made corporations an exception to it, took them out of the operation of those sections that related to execution attachment, and subjected them to a form of execution peculiar to themselves—a form that would either pay the particular creditor out of their visible property, or place all their resources in the custody of the law, to be administered first for the benefit of the public, and next for all creditors alike. It was on this ground Judge GRIER ruled, in Monongahela Co. *v.* Ledlie, 3 *Penn. L. J.* 179, that corporations were not subject to execution attachment under the Act of 1836.

The reason, then, shortly stated, why execution attachments were not extended to corporations, was, that the same statute provided an equivalent remedy, so limited and regulated, as to be more equitable to creditors and more just to the public.

The sequestration reached the choses in action of insolvent corporations, just as effectually as the attachment execution, but it divided them among all the creditors, instead of giving them to one. And yet it is apparent that this legislation did not reach the case of a solvent corporation, whose wealth was all in credits rather than visible goods and chattels. Such a corporation might indeed be coerced into payment by fear of the process of sequestration, but the Act of 1836 gave no execution process except sequestration that could affect its rights or credits. To remedy this, and to subject the rights and credits of solvent corporations to the same execution process as the rights and credits of other debtors, the legislature, on the 20th March 1845, passed an act which has been the subject of great discussion in this case, and which is responsible for our irreconcilable differences of opinion. It extends the attachment execution to corporations, and says that all such process " may be proceeded in to final judgment and execution, in the *same manner and under the same rules and regulations as are directed against corporations,* by the provisions of the Act of 16th June 1836, relating to executions." The word "may" means "must" here. The remedy was new, wholly statutory, and, if pursued at all, must be pursued as the statute directs.

The plain direction of the statute is, then, that the process of attachment execution, now for the first made applicable to corporations, shall be proceeded in in the same manner, and under the same rules and regulations, as are directed against corporations by the Act of 1836. What that manner and what those rules and regulations were, we have seen. We have seen, that the Act of 1836 marked a distinction between solvent and insolvent corporations—subjecting the former to ordinary execution process, and the latter to the extraordinary process of sequestration. The Act of 1845 must be understood as referring to this distinction and maintaining it. So construed, it adds the execution attachment

[Reed *v.* Penrose's Executrix.]

to the other execution process which lies against solvent corporations—but it makes it sequestration process against the insolvent. Until a corporation is ascertained to be so far insolvent, as is implied from 'an execution returned unsatisfied in whole or in part, you may have execution attachment against its choses, as against any other debtor; but the moment that degree of insolvency appears, the only remedy is by sequestration. Penrose might have taken execution attachment in the first instance, and it could have been arrested only by the company's coming in and showing its own insolvency; but, unfortunately for him, he placed on the record the statutory evidence of the company's insolvency, before he took his writ, and therefore he was not entitled to take it at all. This is construing the Act of 1845 according to its letter, and agreeably to the spirit and policy of the Act of 1836.

Counsel insist that the word "corporations" is a mistake, should be cut out, and "individuals" inserted in its stead. Another suggestion is to transpose the word "corporations" to another part of the sentence, the exact effect of which would be the same as to substitute "individuals" for it where it stands. Neither they nor we have any authority to take such liberties with the statute. It does 'not say the proceedings shall be the same as against individuals, but it does say they shall be the same as against *corporations* under the Act of 1836; and we might as well repeal the statute, as to read it otherwise than it is written. Undoubtedly, it was an ill-considered enactment, and there is, I admit, difficulty in giving any construction which will satisfy its terms, and not disorder the system into which it was unduly thrust. But taking into view its terms as they stand expressed, the deficiency intended to be supplied, and the policy of all our legislation on the subject, I cannot doubt the soundness of my construction. And when I observe that this construction is resisted simply by making the statute read differently from what it is written, I do not feel called on to surrender my convictions to such a process of interpretation.

I have now referred to all the legislation, and endeavoured to ascertain its meaning, which relates to executions against corporations, and it is manifest, that the plaintiff's writ, issued after a return of *nulla bona*, was issued without authority of law. For many purposes such a return of a *fi. fa.* is evidence of insolvency, and it is made so expressly by the Act of 1836, and, therefore, is conclusive against corporations. They are put under the stern necessity of paying their debts, or of going into liquidation. An all-sufficient reason, then, for denying the plaintiff the benefit of his writ, is, that the several Acts of Assembly taken together and construed *in pari materiâ*, do not authorize such a writ in the circumstances of this case, but by providing a different,

[Reed *v.* Penrose's Executrix.]

more just, and more equitable remedy, those acts have, by the strongest possible implication, forbidden it.

But I go further. Whether my construction of the Act of 1845 be sound or not—even if we mutilate it as suggested, and put in "*individuals*" for "*corporations*," still this must be granted —that the choses of corporations are to be seized subject to "all lawful claims thereupon." I say this must be granted, because it is a condition impressed by the Act of 1836 on all choses subject to attachment execution, whether of individuals or corporations.

Now what were the "*lawful claims*" on this money in Reed's hands on the 30th day of December 1856 ? His counsel insists, and one of our number thinks, that he had a right to set off the company's indebtedness to him. I am not prepared to admit this, for the whole transactions between Reed and McAllaster, the treasurer, afford a strong implication that he was not to avail himself of a set-off against the company. I cannot consent that the creditor of a company, and he its president, shall get the corporate funds into his hands under an agreement to account for interest and to pay them over on call, and then, instead of paying, set up the company's indebtedness to him. Corporate bonds, bought at a large discount, are an easy form of indebtedness, and if officers of an insolvent company might apply funds to them which they held in trust for the general purposes of the company, the temptation to fraudulent practices would be irresistibly strong, and the ruin of all money-borrowing companies exceeding swift.

But whilst I do not recognise any right of set-off in Reed as a "lawful claim" on these funds, I do consider that the public had such a claim. The Erie Canal Company was incorporated to finish and maintain one of the highways of the state. It was for this purpose the people granted them the power of eminent domain and the right to take tolls. The company had become insolvent, that is, unable to pay its debts. This fact is spread all over the record before us. It is proved in answer to the interrogatories— it is admitted by counsel on both sides, and it was decided by the court below. It was established, moreover, in the way the Act of 1836 prescribed, by an execution returned unsatisfied.

Now what is the law in Pennsylvania in respect to such a company ? When it has accumulated a sum of tolls and water-rents not more than sufficient to repair and maintain the canal for the ensuing year, may a creditor, who has got judgment on the bonds he holds, rush in by execution attachment and sweep those funds into his own pocket ? I deny it. With great deference to all who differ from me, I say it would be a scandal to our law, to make such havoc of public rights. Those tolls and water-rents were earned by the franchise granted by the public; they belonged first of all, in reason and equity, to the maintenance of the canal, which was the consideration of the public grant; they were actually

[Reed *v.* Penrose's Executrix.]

dedicated to that object by the vote of the directors before the attachment execution came; and thus the public had a prior and paramount claim—a very "lawful claim" upon these funds before the attaching creditor acquired any.

What is to become of the canal if judgment-creditors may attach all the tolls? The money to keep it up must be earned, and if Mr. Penrose could seize $13,000 of that money in disregard of the necessities of the canal, and the rights of the public, Mr. Reed might levy his half million of indebtedness as fast as the tolls accumulated—and so might other creditors. Who does not see that in this manner a great public work would fall into speedy ruin, or exist only as a melancholy monument of judicial mistakes.

Judge TILGHMAN told the people of Pennsylvania in 1825, that creditors of insolvent corporations ought to have remedy by sequestration, but that in providing it, the lawful claims of the public should be guarded, and only the net profits be given to the creditor; and the legislature of 1836, as we have seen, enacted it, as a principle in the law of executions against corporations, that improvement companies should be left with the means of repair and self-preservation—a principle which the legislature of 1845 did not mean to violate, but to preserve and perpetuate.

When, therefore, I deny the right of this creditor, and of all creditors, to come in upon this insolvent corporation and take, not the net profits of its business, but the very money that was already actually appropriated to maintain the existence of the canal, I stand not merely on the broad ground of public policy, which were quite enough for my purpose, but on strict legal principles—on positive provisions of statute law. I speak the voice of those statutes, when I say, a judgment-creditor cannot have attachment execution of the earnings of an insolvent improvement company, but that they must go, first to the maintenance of the work, and next to all creditors *pro rata.*

The directors were actually administering The Erie Canal Company on these principles, and so long as they did it faithfully, they were answering all the purposes of sequestration. If any creditor wanted the administration to pass into other hands, he had only to apply to the court for sequestration.

But here comes in another objection—that the company had procured from the legislature of 1850 an Act of Assembly forbidding sequestration at the suit of a single creditor. That act did, indeed, take away the only execution process provided against insolvent corporations, but it gave the creditors an equivalent in the personal liability of the stockholders for the debts of the company. To say that this was a mere modification and not annihilation of remedy, and, therefore, a constitutional law, would be saying a very strong thing; but what can be said in behalf of such a law, in view of the fact that, on the 12th April 1853, the legislature

[Reed v. Penrose's Executrix.]

repealed so much of the Act of 1850 as made the stockholders liable in their private capacity for the debts of the company? This legislation left this insolvent company in possession of its works, more or less productive, and took away from its creditors the only remedy they had by law. I agree with one of the learned counsel, that such legislation was both oppressive and unconstitutional.

Stay laws have been held constitutional, but it never can be maintained that the legislature may abolish debts, which they do when they deny all remedy. This Act of 1850, taken in connexion with the repealing law of 1853, was in conflict with those provisions of the federal and state constitutions which forbid the impairing of the obligation of contracts; and with the 11th section of the 9th Article of the State Constitution, which secures to every man remedy by due course of law, and right and justice without sale, denial, or delay. If companies under pressure of their debts, and the legislature in its haste and thoughtlessness, will fence out creditors by such unwarrantable provisions, the courts are under the most solemn obligations to throw down the fence, and to secure to the creditors of each particular corporation the constitutional rights that belong to corporate creditors in general. Sequestration is the general remedy provided by law for the creditors of insolvent corporations in Pennsylvania, and though the legislature may modify, or perhaps, repeal that law, they cannot, whilst it stands on our statute book, hedge round a particular company so that it shall be subject to execution in no form.

Setting aside the Act of 1850, therefore, as unconstitutional, in so far as it denies sequestration to the plaintiff, my second reason for denying his right to an attachment execution is, that it would frustrate the lawful claims of the public upon this corporation—claims which the statute giving this kind of execution says shall be preserved.

But again. The moneys seized by the plaintiff were in the treasury of the company. I do not embarrass myself with any inquiry about their ear-mark as tolls—nor whether, if they had been stolen, or burned, or embezzled, the loss would have fallen on Reed, or on McAllaster, or on the company. All these and similar questions may be laid out of view, as tending rather to mislead than to enlighten the judgment on the point now under consideration. The fact is, that the moneys in Reed's hands were the treasure of the company, and as such were subject to corporate control, and had indeed been already appropriated to the repairs of the canal. If the company ever had any money in their treasury, that money was in it. Just as the revenues of the government of the United States are in the treasury of the United States, after an Act of Congress making appropriation of them and before draft, though in point of fact they may be in this sub-treasury, or in that,—in

[Reed *v.* Penrose's Executrix.]

the custom-house of New York or New Orleans, or in transit between those points.

When our legislature makes appropriation of moneys in the state treasury, they do not stop to ask whether the money is in the strong box at Harrisburg, or on deposit in Philadelphia. Either way it is equally in the treasury, and subject to legislative appropriation. But once appropriated, the money is thenceforth virtually assigned to a specified object, and can be appropriated to no other. Nor could these moneys of The Erie Canal Company. Kept where the company chose to keep its funds, they had been in due form appropriated to repairs, and after that could only be drawn to be applied to that object. They were no more subject to attachment than any other appropriated but undrawn balances in the company's treasury. Deposits they indeed were, as everything laid down is a deposit, but neither debt nor deposit within the meaning of the Act of 1836; for they were where the company kept their treasure, and so not out of their treasury.

My reasons, then, for denying to this plaintiff the fruits of the attachment execution are,—

1st. That the company being insolvent, the Acts of Assembly did not authorize this writ to issue.

2d. But if the writ did lawfully issue, it could not be levied on the funds in Reed's hands to the prejudice of the canal and the public; that the net profits of the company's business alone was liable to execution, it being an insolvent improvement company.

3d. That the funds were not attachable, because they were within the company's treasury, and not deposits outside of it.

Motion for argument discharged, and record remitted.


Justices THOMPSON and READ, having been of counsel for the defendant, did not sit in the cause.